This is a demonstration of the LP version of the Spectrum Tracer.  I need more room. Core Labs v. Spectrum Tracer Services Mr. Johnson? That's correct. You can proceed. Thank you, Your Honor, and may it please the Court, I'd like to focus on three grounds for reversal of the Board here that can't reasonably be contested on the undisputed facts. They relate to the motivation to combine Hinkle and Deans, the motivation to combine Hinkle and Hall, and the nexus issue on secondary considerations. First, the Board erred in concluding... So those are all reviewed as factual questions, correct? Those are reviewed as factual questions, that's correct, Your Honor. But the record is undisputed, and as I'll illustrate... What's our standard of review on reviewing factual questions from the Board? It's the substantial evidence standard, but of course there has to be evidence, and as I'll explain, there's undisputed record on these points. Beginning with the first point, the Board erred in concluding that an ordinarily skilled artisan would have combined Deans with Hinkle, where Deans directly teaches away from that combination, and it does so in the plainest possible terms. This is a quote, the injection rate should not be so high that the formation will fracture. In addition... Why does that actually teach towards using it for fracking? Because it says if you use this in a method with a high pressure rate, which is what the other reference is talking about, then it will cause fracturing. I think it's talking about incidental fracturing occurring, Your Honor, and I think it would be classic hindsight to say that an ordinarily skilled artisan, which the undisputed definition of that here is three to five years of experience using tracers in hydraulic fracturing, would read a statement like that if it basically says, whatever you do, don't fracture, and say that that could be... Well, that's coming from an area where you want to avoid fracturing, but if you're working from a reference where the whole point of it is to fracture, and you go to this other thing about tracers, and it says don't use high pressure, and you know you're using high pressure because it will fracture, I don't understand how that teaches away at all. Well, as I can discuss... It teaches away from using high pressure if you don't want to fracture, but if you do, it seems perfectly consistent with it. I don't think that's a fair reading of the statement, but I would note that the expert testimony on this point of whether there's a motivation to combine is also undisputed. Dr. Woolley, CORE's expert, spoke to this point. He said, there would be no motivation to combine the teaching of Hinkle and Deans. That's found at page 1568 of the record, paragraph 14. Dr. Jennings never denied his testimony about the vast differences between water flooding operations and hydraulic fracturing, and they are considerable. And he was completely silent on the issue of motivation to combine. Well, the differences are considerable, okay? And the caution in Deans is directed to the water flooding process, and there's no suggestion in Deans that it wouldn't work for hydraulic fracturing, then how is that inconsistent? I think you have to read the reference as a whole, Your Honor, and a direct teaching like that where you're dealing with an expert who has this expertise, they're not going to combine those teachings, and the expert on that particular point is, in fact, undisputed. The second basis I'd like to talk about for reversal of the board is that the examiner's use of Hall as an obviousness reference is a classic case of hindsight as well. Hall discloses the use of tracers to monitor mud circulation in a completely different field, that of drilling. This is before any production begins. Hydraulic fracturing doesn't occur until drilling is completely done. Again, it's undisputed that there are major differences between drilling and fracturing, and this court's teaching in Clay, this court held there, that teachings cannot be considered to be within the same field of endeavor merely because they relate to the petroleum industry. There you had facts where the court says we're not going to treat extraction of petroleum as the same field as storage of petroleum. Here, we think the same principle applies to the idea of drilling versus production through hydraulic fracturing. In addition... Isn't the question of using tracers to determine how much, I'm quoting, of a given material is left in an oil well after injection of materials into the well? I'm sorry, Your Honor, I didn't quite follow. Isn't the 175 patent directed to addressing using tracers, and then I quote it, to determine how much of a given material is left in an oil well after injection of materials into the well? It's talking about the method of determining the extent of recovery of materials injected into an oil well. But you have to read that field of endeavor in light of the amended claim language. That's the teaching of this court in cases such as Biggio and Old Town Canoe, that you have to read the specification in light of the amended claim language. The amended claim language is limited to hydraulic fracturing. It's limited to fluids for hydraulic fracturing. And so you might take an example from a different context. If you had someone who came up with an invention, and it was for a method of improving heating coils. And the method had an application in the context of radiators, and it had an application in the context of toasters. And on reexamination, the application as applied to radiators was invalidated. That would not mean that there might not have been an inventive insight as to toasters. And if the party had surrendered the claim language here, CORE surrendered the embodiments related to things other than hydraulic fracturing. Obviously, originally they thought they had an invention that had broader application. But the specification is very clear that you're dealing with different things here, not similar contexts. Returning to Hall, the background section of the patent teaches, as we've discussed, that the field of the invention is determining the extent of recovered materials injected into a well. Biggio constrains that. Hall itself is not about recovering injected material. Hall relates to monitoring with tracers the circulation of drilling mud in a well during drilling. And the principal purpose of that is to measure lag time. The secondary purposes of that also don't relate to the purposes of CORE's invention. So even if Hall were analogous art, and we don't think it is, it addresses different problems, measuring how long it takes the mud to circulate, mud dilution, mud movement between wells. And it's classic hindsight to say that it's obvious to repurpose the solution to a different problem. You said you don't think Hall is analogous art. Correct. The board said the question is not whether the combined art is analogous to each other, but whether the combined references are each analogous to the applicant's endeavor. Do you agree with that statement? I agree that the comparison is between the prior art and the invention. The applicant's endeavor. Correct. Is the applicant's endeavor what is described in a particular claim, or is the applicant's endeavor what is described in the written description, or is the applicant's endeavor technically the specification, which is both the written description and all of the claims? How do we know what the applicant's endeavor is? Biggio teaches that you have to view the field of endeavor in light of, quote, the claimed invention. So this case obviously involves the wrinkle where the claimed invention changed. And so you have a situation where the specification talks about broader applications. Do you mean by specification are you now saying written description? Correct. Okay. Are now talking about applications that have been surrendered and that are really in a sense no longer relevant. So the specification has to be read, that's what Biggio teaches, in light of that amended claim language. Do we still look at the written description while we're doing that? You still look at the written description, but I think two things are relevant on that point. The first is that if you do look at the written description, it's not like the written description says this is all one big happy thing wherever everything is similar. It talks at length about the differences, and the expert testimony is undisputed on the differences between these subparts of the oil and gas industry. But in addition, if you look at the language of Section 112A, it talks about the specification. The specification is designed to provide a written description that allows people to make and use the invention. But it's the claimed invention that's relevant. So naturally, if the invention that's claimed changes, that has implications for how you look at the specification. And that, we think, is the error of the board here. But it still doesn't mean you can't look beyond the fracking field for art, does it? Well, there's a two-prong test, obviously, for what analogous art is. One is the field of endeavor, and the other is whether it's reasonably pertinent. That's the teaching of Clay and Klein and several other decisions. But because these different areas of art deal with different problems, they're not reasonably pertinent. We think it's hindsight to suggest that they are. Look at what Deans is dealing with. It's dealing with a problem in the context of water flooding, and it's trying to determine the saturation point. Once the saturation point is determined under Deans, it doesn't matter how much of the injected water is recovered. Who's your expert in the field? I'm sorry? Who's your expert? It's Dr. Woolley. No, no. What's their standard? Oh, I'm sorry. What's the ordinarily skilled artist? It's three to five years of experience, and this is undisputed, with the use of tracers in hydraulic fracturing. It's not about the oil and gas field as a whole. What's their training? I believe the record, I can double-check this and speak to it on rebuttal. I believe the record speaks of a bachelor's, and the part I remember specifically is three to five years of experience. Yeah, a bachelor's in petroleum engineering. In some type of engineering. I can check that. I can't recall specifically. But not tracers. The definition is of three to five years of experience with tracers in fracturing. That wasn't my question. He's a petroleum engineer, isn't he? I presume so, Your Honor. I can't recall what specific type of engineering it specifies. Okay. But, again, you're dealing with different problems, and so— That remains a fact question, though, doesn't it, as to what his analogous are? It does, Your Honor. But the evidence— If you look carefully at the testimony of Dr. Woolley and the testimony of Dr. Jennings, you will see that on point after point, Dr. Jennings does not engage Dr. Woolley. That's true across the board as to claim construction. It's true as to motivation to combine if you don't want to reach— if you don't want to decide it on the basis of analogous art. And it's true on the level of ordinary skill. Even on the issue of analogous art, there's much that Dr. Woolley says that is undisputed. If I may, I'd like to address one third point, and it relates to the issue of secondary consideration and the issue of a nexus. The board's sole reason for not considering Korr's evidence of secondary consideration is that it viewed Mr. Hampton's testimony as opinion testimony that had to be corroborated. And that was just a fundamental legal error. The testimony that Mr. Hampton offered was based on his personal knowledge. He was Korr's former president. He gave undisputed testimony that Korr practices every step of the invention. Now, if you look at pages A16 to A17 of the board's decision, what does it say? It says corroboration is required because this is opinion testimony. It wasn't. That was just a fundamental legal error. And once you consider that, then the secondary consideration evidence is undisputed. I see that I'm into my rebuttal time. Unless there are further questions, I'll reserve. Mr. Brown. Yes, thank you, Your Honor. Dennis Brown on behalf of the Appellee Spectrum Tracer Services. I think I would like to start with Ian Rabizio, who seemed to be a main focus of the reply brief and has become a main focus here. And I think it's important to point out that Ian Rabizio does exactly the opposite. What is the evidence on the motivation to combine Hinkle and Deans? Because it seems to me Hinkle gets you almost all the way, and Deans is just getting to the specific tracer method. And Deans is indisputably not in fracturing, but it's in a drilling field. Yes, yes. Is there specific evidence that the board pointed to that somebody of ordinary skill would go to Deans to fill out the hole in Hinkle? Yes, clearly Deans is in the field of endeavor. And, of course, you look, first of all, to Hinkle. And Hinkle discloses a stage fracturing procedure. It's the very same procedure which is disclosed in the examples at the end of the core patents, except he reverses the order of the breakers. He wants the first stage in to break first. So that's really the only difference there. And then he teaches, and the example he has in example 4 in column 17 of the patent says it is simple to verify the effectiveness of these procedures, whether you're successful in recovering all the fracturing fluid from the formation, which is what Hinkle is all about. That's the title of his patent. He says simply do a tracer study. So you're correct. You have all the steps of the claims. You have preparing a fracturing fluid. You have the admixing of tracers with all the stages. You have the injection of the material into the well. And then you have the recovery of the production fluid, and then you're monitoring that for the presence of the tracer. And at that point, you're simply in the lab. You've withdrawn your samples. It's a question of, okay, what kind of data do I get? And clearly Hinkle is teaching you look for the tracers, and he's assuring us that this procedure will be successful. Those tracers follow the material, so you're going to detect them. The question is what do you do with them? Hinkle provides repeated teaching suggestion and motivation, specifically stating that the goal of his procedure is to remove as much fracturing fluid as possible. Then he talks about effective fracture length and effective and saying you want the effective to be essentially the total. You want all of that material out of there. So he provides that motivation to do that. And then you look to these other references, such as Deans or Hall or what have you, and they all involve procedures where you're performing a tracer study for a downhole procedure, and you're recovering the material. Deans doesn't just teach about dispersion or what have you. Deans says that you do a tracer study, and he says the sole purpose of the tracer study is for material balance purposes. And the only thing Deans wants to know about that is how much fluid comes out. That's the whole reason the tracer study is being performed. He also goes to some length to distinguish the tracer study from the procedure which he is doing. He says it's not really material to the procedure. It's not part of the procedure. It's done with the procedure. But the point he's making is you're injecting a fluid into the well. You want it to pick up in a mobile phase and carry some of that out of the well. Now, the tracer isn't picking up that fluid. Just like any other tracer in this field, you want a small amount. You want it to not be interactive with anything else. You just want it to follow the material out. And so what Deans is saying is we're going to inject this fluid, and it's going to carry this stuff out, and then we're going to do a calculation. And part of that calculation is knowing how much of the injective fluid came out as well. Now, Deans could assume that it all came out, but he says, you know, the best way to do it is to do a tracer study and just confirm that it all came out. So he teaches that. Hall specifically teaches that you plot the tracer concentration over time, and the area under that curve is going to give you the amount of tracer that is recovered. And he says that is important. Is that what you need from Hall, is that specificity? Because I was a little confused about why you even needed to get to Hall. It seemed like Hinkle and Deans pretty much covered it. They do. That's what the board said, and the board stopped at that point and didn't go on. Hall is cited for one minor dependent claim in this case. Okay. But, you know, concerning Enre Vigio, at first we were focused on clay, and we pointed out for the board that clay twice, you know, we're not talking about a procedure where one is down a hole and then the other is some procedure for filling the void volume in a tank, as was the issue in clay. Clay twice cites the Wood case as being authoritative, and there the court looked to the field of endeavor, as described in the field of the invention at the beginning of the patent. And we pointed out that all of these references, the field of endeavor in the core patents is the present invention particularly relates to a method for determining the extent of recovery of materials injected into an oil well during oil and gas exploration and production using chemical tracers. All of these references fall right within that description. And then the problem that is being addressed in the core patents is that it would be desirable in the art of oil and gas production to be able to determine how much of a given material is left in an oil well after drilling, fracturing, or any other operation requiring the injection of materials into an oil well. Therefore, under the definition of the problem itself, you see the relevance of drilling or other procedures. But these references fall within that scope under NRA Wood. But then the court looks to NRA BGO and attempts to confine the scope of analogous art to essentially be only anticipatory references which involve the addition of tracers to fracturing fluids. But BGO also favorably cited the Wood case. Here's what BGO says. In favorably citing Wood, BGO states at pages 1323-25, the test for analogous art requires the PTO to determine the appropriate field of endeavor by reference to the explanations of the invention subject matter in the patent application, including the embodiments, function, and structure of the claimed invention. See Wood in his slides there. Then the court has an added parenthetical comment regarding Wood which is very interesting. It actually states that in Wood, the field of endeavor, rather than being expansive, was confined to the scope explicitly specified in the background of the invention. Court latches on to that language, the structure of the claimed invention and attempts to limit the scope as we have said. However, this is completely the opposite of what occurred in BGO. The BGO patent was about a hairbrush. That's all it was about. You look at the claims of that patent and you see repeated limitations saying this is a brush for hair. In Ray Wood, perhaps it's just a hairbrush. But in Ray BGO, they say, no, we're going to look to the structure of the claimed invention and see if other structures might be applicable as well. By golly, they add toothbrushes. That is just exactly the opposite effect of what we see here. In this case, regardless of whether you're with the majority or the minority in Ray BGO, there is nothing about the amended claims of the core patents which takes them out of the field of endeavor or the identification of the problem. The amended claims are still squarely within the definition of the field of endeavor in the patent application, or in the core patents. You don't think the amendments to the claims then change the analysis? No. The language there is still literally right within that definition. Also, determining recovery after drilling, fracturing, or any other operation are identified as simply being different embodiments of the same invention in the core patents. They're literally listed together. The tracer study that you use, the procedures used, they're all the same regardless of the procedure. There are no unexpected or surprising results identified in the core patents regarding fracturing versus the other methods. The patents, as we know from the title, are about a method for determining the extent of recovery of materials injected into oil wells. Strangely, if we accepted core's arguments, that would logically mean that the original dependent claim 8, which had this restriction, the material is a material used for fracturing. The original claim 8 of core patents would not be in the same field of endeavor as claim 1 from which they depended. If I may, regarding core's contention, essentially, that apparently the board is required to take at face value testimony from declarations, I would just note that that is also contrary to the previous decisions of this court. Two good examples, the DeMocco Court v. Van Langsdorff licensing case, 851 F2D, 1392. Also, Weyers v. Master Lock. We're aware of our standard. Okay. You know that you said, and our case law clearly establishes that the patentee must establish a nexus between the evidence of commercial success and the patented invention. And this court's decision in In Re Academy of Science text center was particularly instructive. There, you stated that the board has broad discretion as to the weight to give to declarations offered in the course of prosecution. Citing your, or quoting actually from your previous Weylander v. Garner case, you said, According little weight to broad conclusory statements in expert testimony before the board that it determined were unsupported by corroborating references was within the discretion of the trier of fact to give each item of evidence such weight as it feels appropriate. And then you also said the board is entitled to weigh the declarations and conclude that the lack of factual corroboration warrants discounting the opinions expressed in the declarations. And here, Mr. Hampton submitted a brochure which purportedly described the services but did not show that, or did not confirm that the actual commercial procedure which the court provides, the spectrochem service, includes the concluding step of the claims which is calculating the amount of material recovered. Mr. Hampton tried again. He submitted a supplementary declaration and he submitted what is called an initial flow report. And he admitted that this is the report which they typically give to their customers. And in that report, you see that all they did was plot the concentrations of the tracer over time. There was never any calculation of the amount recovered. Mr. Hampton testified regarding that report at trial, pointed to the plot of tracer concentrations over time, and as has now been done in briefing here, the only thing the court has been able to point to is the fact that in the particular chart that they show, two curves show zero return. And two stages actually of the fracturing procedure show a zero concentration. The others show actual values. So it's court's contention somehow that those two stages where there was no return are a calculation of the amount of material recovered. We obviously don't see that. Those are not calculations. Those are just data points. And the fallacy of that is seen, as we pointed out, in the fact that they've indicated that Spectrum has copied their procedure and pointed to a chart that Spectrum produces where all of the stages of the fracturing procedure were producing. So even in that case, none of them were zero. Here again, we're at a loss under their own definition how anything there could be a calculation of the amount of material recovered. Well, if it pleases the court, I will conclude. Thank you. That's fine. That pleases us. Thank you. In our purity. As Chief Justice Roberts said, he never read a brief and said, I wish that would have been longer. I'd like to do a few quick points, and then I want to speak to Judge Hughes' question about Hinkle because I think that's very important. In terms of the background of the POSA, it's somebody with an engineering degree, unspecified. You'll find it at page 1584 of the record. But I would note that that is irrelevant in light of Henry Clay, which says when you're dealing with these different fields of endeavors and not the same particular problem, the POSA wouldn't pick it up. Second, on nexus. We're talking about fact testimony here. Mr. Hampton testified from firsthand knowledge that tracer concentrations are used to determine the amounts of fluid that are flowing back, page 1018 of the record. Mr. Farrow, the founder of Spectrum, who spent 15 years at CORE and testified to intimate familiarity with CORE's methods, didn't dispute this. We would say no corroboration is necessary, but the brochure does provide it if you need it. Third, on wood. Wood did not involve a claim amendment. And if you look at Biggio, Biggio is not just a one-way ratchet. Just as it suggests that if you adopt the broader claim construction, the field of endeavor might be broader. If you have a narrower claim construction, it might be narrower. Now, on Judge Hughes' comment that Hinkle gets you almost all the way, I want to speak to that because everything in Hinkle that supposedly should have provided the motive to combine existed before Hinkle. Deans is two decades before Hinkle. Hall is a decade before Hinkle. The idea that you want to maximize fracturing fluid cleanup, that's been known since the beginning of hydraulic fracturing. We cite the record sites on page 61 of our opening brief. There were millions of dollars to be made in solving this problem. Hinkle doesn't disclose the combination. Why? Because Hinkle is focused on a very different problem. And I think it's classic hindsight to say that in light of Hinkle, we should have seen it. Hinkle is determining effectiveness in whether the fluid at the end of the fracture returns first. If 10% of the fluid comes back under Hinkle, and it's the 10% at the tip, Hinkle declares success and goes home. Core's innovation was to find that all of the fluid could be recovered by this inventive means. We thank the Court and urge the Court to reverse.